UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

David John THISTLE,
Plaintiff,
v.
Donald John TRUMP, et al.,
Defendants.

Case No.: 26-cv-0744-AGS-GC

**ORDER DENYING MOTION TO SUSPEND U.S. ELECTIONS (ECF 4)**

Plaintiff believes that women are barred from serving in the U.S. House of Representatives. His argument is straightforward: the Constitution refers to a Representative as *he*; the word *he* denotes a man; thus, Representatives must be men. The main problem with this logic is that the Constitution's Framers often used *he* as a generic or common-sex pronoun, the 18th-century shorthand for *he or she*. For this reason, women have always shared many seemingly "gendered" constitutional rights, such as the guarantees that a criminal defendant shall have "the Assistance of Counsel for *his* defence," *see* U.S. Const. amend. VI (emphasis added), and shall not be compelled "to be a witness against *himself*," *see id*. amend. V (emphasis added).

Nonetheless, based on his favored interpretation, plaintiff David Thistle sued President Donald Trump and the State of California for civil-rights violations arising from their enablement of an election system that omits any such "gender or sex requirement." (ECF 1, at 6.) Now Thistle moves to "temporarily suspend[] all State and Federal Elections" and for related relief. (ECF 4, at 1.)

**DISCUSSION**

As plaintiff Thistle is "without counsel," this Court "liberally construe[s]" his motion as a request for some form of emergency injunction. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). To qualify for such an extraordinary remedy, Thistle bears the burden of establishing, among other factors, that he is "likely to succeed on the merits" or has at least raised "serious questions" about the merits. *Fellowship of Christian Athletes v.*

*San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 683–84 (9th Cir. 2023) (en banc); *see also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (listing the four preliminary-injunction factors); *Babaria v. Blinken*, 87 F.4th 963, 976 (9th Cir. 2023) ("[T]he legal standards applicable to [temporary restraining orders] and preliminary injunctions are 'substantially identical.'"). To have any hope of carrying that burden, he must first sufficiently demonstrate that the Constitution precludes women from serving as House members.

To rate Thistle's chances, the Court must interpret what the constitutional text meant "[a]t the time the Constitution was ratified." *See Consumer Fin. Prot. Bureau v. Community Fin. Servs. Assn. of Am.*, 601 U.S. 416, 427 (2024). The issue boils down to whether the Constitution's ratifiers understood the word *he* as a generic or masculine pronoun in the House Qualifications Clause:

> No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which *he* shall be chosen.

U.S. Const. art. I, § 2, cl. 2 (emphasis added). For this inquiry, the Court inspects the textual clues in the word itself, the surrounding context, historical practice and tradition, and precedents interpreting this and similar constitutional language. *See United States v. Vaello Madero*, 596 U.S. 159, 162 (2022) (analyzing a constitutional question in "light of the text of the Constitution, longstanding historical practice, and this Court's precedents").

**A. Textual Analysis**

We begin with the "normal and ordinary" meaning of *he* in the founding era. *See Washington v. Trump*, 145 F.4th 1013, 1027 (9th Cir. 2025). At that time, there were two relevant definitions: (1) "The man that was named before" or (2) "the person."[1] *He*,

---

[1] The full second entry is: "The man; the person. It sometimes stands without reference to any foregoing word." *He,* 1 S. Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1785). In the 18th century, the term *man* often signified "Human

1 S. Johnson, A DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1785). In the context of the Constitution, however, jurists and scholars seem to overwhelmingly agree that "'he' was used as a generic pronoun," and it was "standard," at least for such foundational documents, to use "masculine pronouns to refer to all people in the generic sense." *See Defending Educ. v. Olentangy Local Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 785 (6th Cir. 2025) (Bush, J., concurring); *see also* Kevin Tobia, Brian G. Slocum, & Victoria Nourse, *Statutory Interpretation from the Outside*, 122 COLUM. L. REV. 213, 250 (2022) ("[T]he Constitution refers frequently to 'he' and 'his,' but there is little dispute today that those pronouns include women."); Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 129 (2012) ("In the Constitution, the President is referred to many times with the pronouns *he*, *him*, and *his*. These references, by common grammatical understanding, refer to a President of either sex.").

In fact, in 1871 Congress enshrined this historical practice in the Dictionary Act, which explained that "in all acts hereafter passed," "unless the context shows that such words were intended to be used in a more limited sense," "words importing the masculine gender may be applied to females[.]" Act of Feb. 25, 1871, ch. 71, § 2, 16 Stat. 431. That remains the law, albeit with slightly different phrasing. *See* 1 U.S.C. § 1. Based on this time-honored understanding, courts have long employed the interpretive principle that, "[i]n the absence of a contrary indication, the masculine includes the feminine (and vice versa)." *F.D.I.C. v. RBS Securities Inc.*, 798 F.3d 244, 258 (5th Cir. 2015) (quoting Scalia & Garner, READING LAW, at 129).

The case for the generic pronoun grows stronger still if we widen our focus from the word *he* to the entire passage. Consider how it begins: "No *Person* shall be a Representative . . . who shall not, when elected, be an Inhabitant of that State in which *he* shall be chosen."

---

being." *Man*, 2 Johnson, DICTIONARY. Indeed, the example usage provided for this second entry is an aphorism employing *he* in the sense of "human being" or "person": "*He* is never poor [t]hat little hath, but *he* that much desires." *He*, 1 Johnson, DICTIONARY.

U.S. Const. art. I, § 2, cl. 2 (emphasis added). First, the term *Person* would be an oddly inclusive choice to start a clause designed to exclude half the population. Second, the best way to tell if *he* was intended in the "man" or "person" sense is to look at its antecedent—the word it's replacing. The antecedent here is *Person*, not "man." Nor is it, as Thistle assumes, *Representative*. The antecedent-pronoun relationship is easier to see if we rephrase this requirement as: "A *Person* shall not become a state's Representative unless *he* [the *Person*] is an inhabitant of that state when elected." Thistle may view *Representative* as a male-only concept, but *Person* indisputably stood for "man or woman." *See* 2 Johnson, DICTIONARY. Case closed (grammatically speaking).

This point about syntax highlights an absurdity in Thistle's insistence on the male pronoun. If we assume *he* signified the "man that was named before," then its antecedent, *Person*, must also be a man. Thus, the clause would mean: No *man* (male Person) shall be a Representative unless *he* (masculine pronoun) satisfies the age, citizenship, and residency provisos. But that places no constraints on female candidates whatsoever. Let's call it the *Lord of the Rings* loophole. In the film version, a lone warrior named Eowyn confronts the supposedly invincible Witch-king of Angmar. The Witch-king scoffs: "You fool, no man can kill me." In a fatal lesson about the perils of gender-restrictive language, Eowyn reveals herself as a woman and slays him, retorting, "I am no man." THE LORD OF THE RINGS: THE RETURN OF THE KING (New Line Cinema 2003). Likewise, if this clause's terms are confined to their masculine sense, a foreign baby girl could exploit the same grammatical loophole and become a House member. Presumably, she'd have this explanation embossed on her onesie: "I am no man [male Person]. Those limitations don't apply to me." (To be clear, there is no reason to think the Founders endorsed such an absurdity.)

But that's not all. Next, consider this clause's function: eligibility criteria for Representatives. Normally, membership rules—especially ones so consequential—are set forth expressly. Why would the Framers proclaim three explicit conditions (age, citizenship, and inhabitancy) and then leave a fourth (gender) to implication? If they wished to preclude women, they could have simply written "male inhabitant" or "male

citizen." *Cf.* U.S. Const. amend. XIV, § 2 (referencing "male inhabitants" and "male citizens" in the Apportionment Clause). The absence of a clear and indisputable male-only stipulation in this provision speaks volumes. "The fact that an instrument drawn with such meticulous care"—and by writers "who so well understood how to make language fit their thought"—"does not contain any such [express] limiting phrase . . . is persuasive evidence that no qualification was intended." *United States v. Sprague*, 282 U.S. 716, 732 (1931).

The expectation that the Framers would make any gender restrictions explicit—rather than tucking them into pronouns—is more than common sense. It accords with our constitutional "framework of ordered liberty," which is "designed to maximize individual freedoms." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "Freedom is the general rule, and restraint the exception." *Charles Wolff Packing Co. v. Court of Industrial Relations,* 262 U.S. 522, 534 (1923). Hence, constitutional barriers to personal liberty, including the freedom to run for office, should be set forth in clear and unmistakable terms. And any ambiguity in the word *he* should be resolved in favor of the definition with universal application.

Thus, the term *he* in the House Qualifications Clause was used as a gender-neutral pronoun, which at the time meant *he or she*. At least, Thistle's textual arguments do not raise serious concerns that it should be construed another way.

**B. Case Law**

Nor has Thistle cited any contrary authority. In fairness, this appears to be a matter of first impression. This Court found no controlling case that squarely addresses whether the Constitution's gendered language necessarily excludes women. Yet the closest relevant precedent cuts against Thistle's reading. In *Powell v. McCormack*, 395 U.S. 486 (1969), the Supreme Court presumed that this provision set only "three standing qualifications" for members of the House of Representatives, involving "age, citizenship, and residence." *Id.* at 489, 520. If the word *he* in the House Qualifications Clause unmistakably established a "men only" caveat, surely one of the Justices would have noticed. What's more, the *Powell* Court went on to list other arguable prerequisites for House membership, tellingly omitting

gender. *Id.* at 520 n.41 (discussing disqualifications for those who are "convicted in an impeachment proceeding," or already hold "Office under the United States," or are oath-breakers who "engaged in insurrection or rebellion").

Thistle fares no better with the cases addressing the gendered language of other constitutional provisions. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court interpreted the Fifth Amendment guarantee that a criminal defendant shall not be compelled "to be a witness against *himself*" as applying "to all individuals." *Id.* at 472, 479 (emphasis added). The High Court took a similar approach in construing an accused's Sixth Amendment rights "to be confronted with the witnesses against *him*; to have compulsory process for obtaining witnesses in *his* favor, and to have the Assistance of Counsel for *his* defence." *Strickland v. Washington*, 466 U.S. 668, 685 (1984) (quoting U.S. Const. amend. VI (emphasis added)); *see id.* (reiterating that the Sixth Amendment right to counsel, through "the Due Process Clauses," extends to any "*person* accused of a federal or state crime" (emphasis added)).

In sum, Thistle has not shown that he is likely to prevail, nor even raised serious questions on that score. Because "[l]ikelihood of success on the merits is the most important [injunctive-relief] factor," the Court "need not consider" the others. *Geo Group v. Inslee*, 151 F.4th 1107, 1114 (9th Cir. 2025) (cleaned up). Thistle has not met his burden for an emergency injunction.

## CONCLUSION

In 1916, when "Jeannette Rankin became the first woman elected to the House," her eligibility was never legally challenged. *See* Elizabeth D. Katz, *Sex, Suffrage, and State Constitutional Law: Women's Legal Right to Hold Public Office*, 33 YALE J. OF L. & FEMINISM 110, 179 (2022). Today, over a century later, hundreds of women have served in Congress's lower chamber. *Women Members by Congress: Historical Data*, U.S. HOUSE OF REPRESENTATIVES: HIST., ART & ARCHIVES, https://history.house.gov/Exhibitions-and-Publications/WIC/Historical-Data/Historical-Data---Nav/ (last accessed Sept. 30, 2026). Thistle insists that they were all seated unconstitutionally. But his argument rests on a

slender semantic reed: the word *he*. Thistle has not shown that it can bear that colossal legal weight. The Court concludes that the House Qualifications Clause used the generic form of *he*—a pronoun referring merely to a "person."

Plaintiff's motion to suspend American elections and for other preliminary relief is **DENIED**.

Dated: September 30, 2026

Hon. Andrew G. Schopler
United States District Judge